## SEABOARD AIR-LINE RAILWAY *et al. v.* ROCK.

The verdict in favor of the plaintiff was contrary to the evidence and without evidence to support it, and the court, therefore, erred in overruling the motion for a new trial.

Argued November 14, 1908. — Decided August 10, 1909.

Action for damages. Before Judge Ellis. Fulton superior court. July 1, 1908.

*Brown & Randolph,* for plaintiff in error.

*Tye, Peeples, Bryan & Jordan* and *C. P. Goree,* contra.

Fish, C. J. The plaintiff, Mrs. Rock, recovered a verdict against the defendants, the Seaboard Air-Line Railway and W. F. New, one of its engineers. There was a motion for a new trial, based only upon the general grounds, which the court overruled, and the movants excepted. The suit was for the recovery of damages for the death of plaintiff's husband, E. B. Rock, who was killed on January 19, 1906, in a collision between two of the defendant railway company's trains, which caused the deaths of four persons. These two trains were a regular freight-train, called No. 22, of which the defendant New was the engineer, and an extra work-train of fifteen or sixteen cars, all loaded except two or three, pulled by a switch-engine, in the cab of which E. B. Rock was riding at the time the collision occurred, which was called No. 508. On the afternoon when the collision occurred, train No. 22, which was going north, was under orders from the train dispatcher's office in Atlanta to stop at Mina, a station on the railway company's line near Atlanta and between that city and Belt Junction, another station, until 6.30 p. m. (Eastern time) for two trains running in the opposite direction, one of which was freight-train No. 564 and the other the work-train No. 508, which trains it was to pass at that point. Plaintiff's husband, Rock, was a telegraph operator in the employment of the defendant railway company at its office at Belt Junction, about four miles north of Mina. At 5.45 p. m. he received from the train dispatcher's office in Atlanta a train order directed to the conductor and engineman of 508, the extra work-train. This order was as follows: "For Belt Junction Station. To conductor and engineman of Ex-508. Eng. 564 will run extra Tucker to Howells. Work extra 508 will protect against extra 564 south between Belt Junc-

tion & Howells. No. 22 Eng. 681 will wait at Mina until six thirty 6.30 p. m. for work extra 508 and extra 564 south." Below this order were the words: "Conductor and engineman must each have a copy of this order." Under the rules of the railway company, a telegraph operator was required to take train orders wired to him, in manifold copies, on blank forms prepared for the purpose, on which there was a blank space where the conductor, or other train employee to whom the order was addressed, was required to sign his name when the order was first presented to him by the telegraph operator. It was shown by the evidence for the plaintiff, as well as that for the defendants, that when a telegraph operator received a train order such as the one above indicated, it was his duty to enter thereon the time when it was received and repeat it back to the train dispatcher's office, from which, when the message was correctly repeated, the reply "O. K." came, which, with the time of its receipt, the operator entered upon the order. In this condition, that is, when the order had been repeated back to the train dispatcher and had been, to use the language of the witnesses, "O. K'd" by him, the order was, under the rules, a "hold" or waiting order for the train to which it was addressed, requiring that train. to be held at the station where the order was received until the order was rendered "complete." The further steps necessary to be taken to render the order "complete," so as to change it from a "hold" or waiting order to one for the government of the movement of train, were as follows: When the train arrived at the station where the order was awaiting it, it was the duty of the telegraph operator who had received the order from the dispatcher's office to present the order to the conductor, or other train employee, to whom it was addressed, and have him sign his name in the space at the bottom of the form on which the order was written by the operator, after which the operator was required to repeat the signature, by wire, to the train dispatcher's office and then wait until he received the response "complete" before presenting the order to the conductor or trainman to whom it was addressed, as a complete or final order; the operator being required to enter the word "complete" upon the order and the time when this word was received from the train dispatcher. A copy of the order now in question was introduced by the plaintiff, from which it appeared that Rock received it at

5.45 p. m., that it was "O. K'd" from the dispatcher's office at 5.49 p. m., and rendered "complete" at 6.13, p. m. Yet the evidence for the plaintiff showed that train No. 508 did not arrive at Belt Junction until 6.20 p. m. Rock had, without waiting for its arrival and getting the signature of its conductor, Gorman, to the order, and then wiring such signature to the train dispatcher, signed the conductor's name to the order and telegraphed the signature to the train dispatcher, as though Gorman himself had made it, and by this means had been able to receive the response "complete" from the train dispatcher, seven minutes before conductor Gorman saw the order, or the arrival of his train at Belt Junction. When the train arrived at Belt Junction, Rock, who had already closed his telegraph office for the day, walked up to the conductor, who had got down off the engine, and presented him, and also the engineer, with a copy of the order. This occurred some fifty or sixty yards from the telegraph office. The conductor, as the rules required, read this order aloud in the presence and hearing of the telegraph operator, the engineer also being present when it was read. After the conductor had read the order aloud, the engineer asked him if he wanted to go to Mina; to which the conductor replied that he "would go if he [the engineer] could make it all right." The engineer said he could, and that they "would go, and got on the engine and started out." The conductor stood at the switch and closed it and then got on the rear of the train. Rock, the telegraph operator, got on the engine when it started, to ride to Atlanta, where he resided. He did not ask permission of the conductor or the engineer to ride upon this engine or train, but neither made any objection to his doing so. Under the rules of the company, he had no right to ride there, even with the permission of the conductor and engineer, but he had upon other occasions ridden to the city upon the switchengine, after the close of his day's work at this station, and other telegraph operators who had worked at this station had also done so. The testimony for the plaintiff showed that if Rock had followed the rules of the railroad company, by waiting until this train arrived at Belt Junction and getting the signature of the conductor thereof to the order and then going to his telegraph office and wiring such signature to the train dispatcher, and waiting until he received from that official the reply "Complete," be-

fore presenting the order to the conductor as a complete or final order for the movement of his train, it would have been at least 6.25, p. m., and probably later, before the order was rendered "complete" and thus changed from a "hold" order to one regulating the running of the train. Gorman, the conductor of this train, who was a witness for the plaintiff, testified: "When we got to Belt Junction, it was 6.20 when I stopped where Mr. Rock was at the switch. We left Belt Junction at 6.21 p. m. This train order was handed to me by Mr. Rock; he was the operator at Belt Junction, the only operator there. He was walking towards the engine when I got off the engine, and he handed Mr. Taylor [the engineer] one and me one, a copy of the same order. I read that order, read it aloud before Mr. Taylor and Mr. Rock. The operator's office was shut up at that time; the door was closed. I didn't see any light. We were standing from the office about fifty or sixty yards, I suppose, something like that. . . When Mr. Rock handed me train order No. 65, my name was signed to that. I suppose Mr. Rock signed my name to it. I didn't sign it. By making an order "complete" we mean when the conductor's name is signed to it and repeated back to the dispatcher's office, and when he signs the order and it is repeated back, he sends the word "complete." That order was made "complete" at 6.13 p. m. Under the rules, after the conductor signs the order he repeats it back to the dispatcher. . . The collision occurred at 6.27 p. m. The rule requires us to clear a train of superior right five minutes. We should have been in five minutes. We should have been in at 6.25. Train 22 is a superior class, that is a regular schedule train, and 508 is only an extra work-train running by special orders. Train No. 22 was the superior train, and under the rules we should have been in the clear at 6.25. If Mr. Rock and I had walked from the engine back to his office and he had called up the train dispatcher, it would have been, in my opinion, before my train could have moved from there, something like five or ten minutes. My name was signed to that order in the space left for that purpose on the order. It was my business to sign the order. . . When Mr. Rock received the order for the movement of my train it was repeated back. The order had to be repeated back to the dispatcher's office. The dispatcher O. K'd it; they responded O. K. to it. That didn't complete it; it only O. K'd it.

It àcted only as a hold order; it is no good until it is signed for and 'complete' given to it, and then it is ready for use. If he gave me an order that only had O. K. on it and didn't complete it, it would hold my train there until completed. I suppose Mr. Rock wrote the word "complete" on it. Everything was all right, except I ought to have signed the order myself. I didn't sign it because he had my order out there with my name signed to it for use, ready to use it. I didn't object to it. It would have just caused delay to have gone back and got new orders; that is all. I treated it as my signature." Brown, another witness for plaintiff, testified that he was general yardmaster for the defendant railway company, with Howell Station as his headquarters, from August 26, 1896, till December 31, 1903, and that "If a train with 15 or 16 freight-cars, a switch-engine pulling them, goes to Belt Junction, gets its train orders, and pulls out from Belt Junction to Mina, if in leaving there the conductor stands at the end of the train until it passes through, throws the switch and gets up on the rear car, and the train goes forward, it would take to get from Belt Junction into the side-track at Mina not less than 12 minutes." McDaniel, another witness for plaintiff, testified that he was yard foreman for the defendant railway company, and was in January, 1906. He further testified: "The distance from Belt Junction to Mina is four miles. With a train of 16 cars, most of them loaded, equipped as 508 was, it ought to run the distance between Belt Junction and Mina——four miles —in eight minutes. It is down grade. To do that, it would have to run every inch of the way about 30 miles an hour. . . If that 508 engine with 16 cars, all of them full, with the exception of may be one or two, may be three, was standing in the side-track at Belt Junction, and it had to come out on the main line and then throw the switch and then start off, in my opinion it would take to get down there a little more than eight minutes, about three or four minutes longer I guess, certainly not less than three."

It seems plain from this testimony of the plaintiff's own witnesses, that the work train upon which Rock, plaintiff's husband, was riding when he met his death, would not have started on· its fatal run from Belt Junction to Mina, if Rock had not perpetrated a fraud upon the train dispatcher, by signing the conductor's name

to the "hold" or waiting order and wiring the signature to the train dispatcher. It seems clear that but for Rock's gross and culpable misconduct there would have been no collision and consequent loss of life; for it is beyond the range of reasonable conjecture that the conductor and the engineer of this train would have been so utterly reckless of their own lives and the lives of others, to say nothing of the property involved, as to undertake to make the run to Mina before No. 22 was due to leave that station, if they had waited at Belt Junction until a running order for their train could be regularly and honestly procured. Even as it was, the conductor seemed, from the question he asked the engineer, to think that there was no time to lose if the attempt to meet the other train at Mina was to be made; and even his testimony, upon which alone the plaintiff had to rely to show that train 22 had left Mina before 6.30 p. m., showed that although his train made the run from Belt Junction to the point where the collision occurred, without stopping, or even checking its speed, at either of two road crossings, at least one of which was a public one, it lacked half of a mile of reaching Mina after a run of six minutes. So taking the testimony of the plaintiff's witness, Gorman, the conductor of train No. 508, who had connived at Rock's gross and intentional violation of the rules of the company, by accepting and acting upon an order which he was bound to know had been procured by a fraud perpetrated by Rock upon the train dispatcher, to be true, that is, that train No. 22 had passed Mina and reached the point of collision at 6.27 p. m., and rejecting the testimony of seven or eight witnesses for the defendant, four of whom were not connected with the railway company in any way, from which it appeared that No. 22 did not pass Mina before 6.30 p. m., still, we think, the evidence demanded a verdict for the defendants. For though, under Gorman's testimony, New, the engineer of No. 22, was negligent and without such negligence the collision could not have occurred, still it is also equally clear that but for the gross misconduct of Rock there would have been no collision and he would not have lost his life. Rock's misconduct was as much the proximate cause of the catastrophe as the negligence of New, if such negligence there was. Rock may be said to have intentionally and deliberately, and apparently to suit his own convenience merely, started No. 508 on its fatal run to Mina

at a time when it was his duty to hold it at Belt Junction to await the further order of the train dispatcher; and to have thereby caused the collision which resulted in his death. He deliberately and wrongfully set in motion an agency without the existence of which there would have been no collision. If he had survived his injuries, could he have recovered from the defendants for the consequences to himself of his own intentional misconduct? We think not. As he could not have recovered, if his injuries had been less than fatal, his widow can not lawfully recover for his death. The court below should, therefore, have granted a new trial upon the general ground that the verdict was contrary to the evidence and without evidence to support it.

*Judgment reversed. All the Justices concur.*